No. 43,401

STATE OF KANSAS, *Appellee*, v. GERALD LEE WOODS, *Appellant*.

(381 P. 2d 533)

Opinion filed May 11, 1963.

*Chester I. Lewis*, of Wichita, argued the cause and was on the briefs for the appellant.

*Howard Hudson*, of Fort Scott, argued the cause and *William M. Ferguson*, attorney general, and *Charles M. Warren*, county attorney, were with him on the briefs for the appellee.

*Walter B. Patterson* and *Frank O'Brien*, both of Fort Scott, were on the briefs as *amici curiae*.

The opinion of the court was delivered by

JACKSON, J.: On the evening of August 20, 1962, John D. Rogers had a date with Lola Stuteville, who was then eighteen years of age. They attended a movie in Fort Scott and then drove out to Gunn Park at the southwest edge of town. Rogers parked his Mercury sedan north of the south shelter house in the park. Rogers and Lola were sitting in the front seat smoking and listening to the radio and had been parked only about five minutes when Lola heard footsteps on her side of the car. Three or four figures stood near the car. Lola screamed. Rogers on looking closely could see that they were colored men. He criticized them for sneaking up and scaring them. They asked for money and cigarettes. He had no money but gave them cigarettes. He then noticed that there were about three or more on his side of the car also. He

then attempted to start his car but they grabbed his arm and prevented him from doing so.

One of the Negroes on Lola's side of the car opened the door and sat down in the seat beside her. Rogers was pulled out of his seat on the driver's side and another one of them got into the seat on the other side of Lola. Lola, badly frightened, jumped over the back of the front seat and out of the car on the driver's side, ran up to Rogers and held on to his arm.

There is no reason to go into detail of all that occurred, but they attempted to make Rogers and Lola have intercourse in the back seat of the car. When this failed, they took Lola and Rogers to the shelter house and attempted to force them to have intercourse on the table. After about five minutes, Rogers was pulled away and they began taking turns raping Lola. During this time she was raped ten or twelve times.

Gerald Lee Woods was the first of the boys to be tried. The appeal here is apt to be followed in the other cases. It might be said that appellant's counsel has brought into the picture almost every objection possible.

The appellant first raises the question of the denial of a continuance. In the case at bar, defendant was first charged only with the crime of rape on August 23, 1962. On August 27, he was charged with kidnaping in the first degree as well as with forcible rape. Within thirty-two days after his arrest, the trial date of the defendant had been set. The fact that defendant's counsel lived in Wichita was not a matter which could be taken into consideration in finding that he was not ready for trial. As far as the record would indicate, counsel for the defendant was entirely ready and most alert in making every point for his defendant.

But while appellant argues that he needed more time in which to prepare his case, we would rather think that had there been any delay, counsel would have been the first to argue that his defendant was entitled to a speedy trial. We find no abuse of discretion in compelling defendant to go to trial at the time the case was set. *State v. Sweet,* 101 Kan. 746, 168 Pac. 1112; *State v. Johnson,* 70 Kan. 861, 79 Pac. 732; *State v. Wiswell,* 128 Kan. 659, 280 Pac. 780, Syl. 1; and see *State v. Badgley,* 140 Kan. 349, 37 P. 2d 16.

Not to overlook anything, it is then contended that defendant was entitled to bail. Section 9 of our own Bill of Rights to the state constitution reads as follows: "All persons shall be bailable by suffi-

cient sureties except for capital offenses, where proof is evident or presumption great. Excessive bail shall not be required nor excessive fines imposed nor cruel or unusual punishment inflicted." First degree kidnaping is a capital offense and the jury convicted the defendant although they did not assess the death penalty. It would seem clear that the presumption was great and the proof evident.

The appellant filed a motion for change of venue and argues strongly that feelings ran high against the defendants in the town. Notice also that the affidavits and motion filed asked that the case be removed from the district as well as from the county since the application was evidently filed under G. S. 1949, 62-1319, and not under G. S. 1949, 62-1318: It should also be noted that the application was not made during the term of defendant's arraignment under provision of section 62-1324 and should not have been considered without an additional affidavit under section 62-1325. Needless to say, there were no affidavits showing that the defendant could not receive a fair trial in Linn or Miami county, which counties are a part of the same district with Bourbon county of which Fort Scott is the county seat. The state did file an affidavit showing that a fair trial could be had in Linn county. Moreover, there were a number of affidavits taking issue with the ones filed by the defendant. See section 62-1321. The trial court took the question seriously, passed upon it and found that there existed no serious threat of violence or feeling against the defendants in general and that a fair trial could be had in Bourbon county. We know of no reason why the court should be reversed on this holding.

The state cites the case of *State v. Parmenter*, 70 Kan. 513, 79 Pac. 123, which is in point on the matter, and which came from the same county.

The defendant next makes a strong argument to show that the jury which tried the defendant was not impartial because of the fact that it was claimed no Negro had sat on a jury in Bourbon county since 1936, citing many cases since *Bush v. Kentucky*, 107 U. S. 110, 1 S. Ct. 625, 27 L. Ed. 354.

In order to prove discrimination, defendant introduced Exhibit 1, which was an excerpt from the 1950 and 1960 U. S. census reports prepared by an official state agency, the Kansas Commission on Civil Rights. This exhibit shows that the total population of Bourbon county for the year 1950 was 19,153, of which number 18,478 were white and 675 non-white, or 3.5%. Of the 675 non-whites, 661 or 3.45% were Negroes.

While the state attacks this showing as not being an official document and actually of no worth, it agrees to assume that the figures are correct. But the state attacks the exhibit mainly on the ground that there is no showing of how many of the Negroes were between the ages of twenty-one and sixty-five and therefore eligible for jury duty. While it is said in the briefs that all Negroes in the county live in Fort Scott, that would not appear to be accurate as to the census figures.

It was further shown that often no jury is called during an entire term of court.

After full consideration, the trial court gave the following ruling:

"THE COURT: The figures that were submitted in Defendant's Exhibit Number 1 show the 1960 population of the county was 16,090 and the Negro population of 582, and non-white population of 3.7 of which 582 are Negro and fifteen other races, or a Negro population of the county of approximately 3.6 per cent. That would tie in with Mr. Owen's testimony. As I recall, he said there were some three or four hundred votes at the general election that were Negro votes and that the Negro population as shown in 1950 is 661. In 1960 it is 582, showing a decline, not quite as large proportionally as the decline in the population of the county. The non-white population is shown as 3.5 percent in 1950 and 3.7 in 1960. At any rate, gentlemen, the problem we have here is not whether or not there are Negroes serving on the jury selected to try the case, but whether or not Negroes as a separate class are being arbitrarily discriminated against in not having their names picked for jury service. The problem is to have jury lists drawn from the proportions that are drawn strictly by lot and by chance and not by design. Of the one hundred thirty or forty jurors who were drawn in the present instance for the trial of this action, or for service at this term of court, as pointed out by counsel, there were only four Negroes who were drawn and only one of those was notified and appeared for jury service. And as I have already indicated in the record here, for reasons of personal health he asked to be excused and was excused from jury service. I feel that the question here is not what has been previously the picture in the county with regard to juries but what is the picture on this present jury. Since there are presently three Negroes who have been drawn on the jury list, along with a number of other jurors who are still available for service at this term of court, I feel that the county officials in drawing this jury list for the trial of the present case did not exclude arbitrarily any members of a particular race, sect or class, and, therefore, I will overrule the motion to quash and discharge the panel. With reference to the manner in which they were drawn, of which the lists were made up, I believe the testimony established that there are presently no Negroes living in the county outside the limits of the City of Fort Scott. The four Negroes who were drawn on the panel are residents of the City of Fort Scott, so it is apparent that the names of Negroes are on the jury lists prepared and submitted within the City of Fort Scott. Now, with reference also to the making of the lists, the county assessor testified that the trustees, I believe,

bring the lists to him and he takes them to the county clerk, I presume on a form in the book which the assessors use and is certified by the trustee who does the assessing in the township, and then the list is simply turned over by him to the clerk. At any rate, the lists are apparently prepared correctly in the townships. The drawing of the jurors is done apparently in compliance in all practicable respects to conforming with the statute, is done by the required officials in the jury room. While it may be the county clerk actually types up the lists, it may not be her hand that goes into the box. I think the drawing is done, according to the evidence of the deputy county clerk who testified, in all practicable respects in conformity with the statutes. I might say that some months ago, in fact upon reading the Florida case, Hoyt against Florida, which was a case in which the defendant, a woman, took an appeal to the Supreme Court alleging that there had been an arbitrary exclusion of women from the jury lists in the State of Florida. I, upon reading that, was referred back to the Hernandez case and read at that time some of the annotations and at that time realizing that the problem was not confined to those states in which the particular cases were appealed from, advised all the county clerks in my district, that I would expect them to comply strictly with the law and to draw the jurors without question as to race, creed or color, and that there should be no arbitrary exclusion of anyone from jury service, whether it be on account of his religion, his race or any other reason. The only reason that the officials may not add the name on the jury list is because they have knowledge that the person is deceased or has removed from the county or is insane. I feel that the officials are presently properly exercising their offices and I will not quash the present panel. Gentlemen, I expect at this time we should have a few moments recess and then we will proceed."

Thus, the court shows that he had taken steps some time before to set aright the jury lists of Bourbon county so that four Negroes were actually drawn for the jury in this case.

We would raise a technical question as to wether appellant's challenge to the array was made in time. Challenges to the array at common law must be made at once and before the beginning of the *voir dire*. As we read appellant's brief and abstract, counsel readily admits that the *voir dire* was about over before he ever challenged the array. We would direct attention to the case of *State v. Logan*, 344 Mo. 351, 126 S. W. 2d 256, 122 A. L. R. 417. In this case, decided in 1939, it was held that a challenge to the remaining members of the jury amounted to a challenge to the array and could not be allowed after the *voir dire* examination had begun.

Four Negroes were drawn on the panel; the one notified was excused for health reasons from the present jury, therefore we fail to see how it can be contended that there was discrimination in this case.

Appellant next attempts to base error upon the order refusing to

provide for the separation of witnesses. It seems that in Fort Scott there are no facilities for such separation and the court therefore must deny such a request. But the appellant is brave enough to admit that the ruling is simply based upon the sound discretion of the trial judge. Furthermore, this court held in *State v. Davis*, 48 Kan. 1, 28 Pac. 1092, which was a capital case, that there was no abuse of discretion in denying such an order. See also *State v. Sweet*, 101 Kan. 746, 168 Pac. 1112, a murder case.

Under the sixth section of his brief, the defendant contends that he was in fact charged with the crime of conspiracy and tried therefore although he was not so charged in the information.

The trouble here is that conspiracy has never been considered to be an indictable offense in this state. See *State v. Robinson*, 124 Kan. 245, 259 Pac. 691. See also *State v. Borserine*, 184 Kan. 405, 337 P. 2d 697. We believe instruction No. 9 clearly followed *State v. Borserine*, supra.

Next, the defendant objects to the fact that instruction No. 6 omitted the part of the statute G. S. 1961 Supp. 21-449, which deals with secret confinement in first degree kidnaping. In the case of *State v. Brown*, 181 Kan. 375, 312 P. 2d 832, the kidnaping statute was defined in a case which had much the same facts involved as this case. The same arguments were made in the Brown case and specifically answered. We shall not repeat them herein, but see p. 384, *et seq*.

The last matter referred to in defendant's brief is the contention that the court should have instructed on second degree kidnaping and attempted rape. The state first mentions that nothing is abstracted as to requested instructions on these points. So any error thought possibly to exist would be waived on the record before us.

It is pointed out by the state that the same objection was raised in *State v. Brown*, supra. See p. 390, *et seq*. As said there, "the defendant was either guilty of kidnaping in the first degree under the evidence or he was not guilty of kidnaping in any degree."

The case at bar seems to be a stronger case than the Brown case, so the above quotation should be important.

Likewise, if it be thought that the evidence in this case would convict the defendant of attempted rape but not of the crime of rape, the jury should acquit the defendant, and he would have no ground to complain that the attempt was not put into the picture.

We feel that the defendant had a fair trial. He was found guilty as charged. Therefore, the judgment of the trial court is affirmed.

PRICE, J., concurs in the result.