No. 48,356

STATE OF KANSAS, *Appellee,* v. MICHAEL BLUE, a/k/a MICHAEL JACKSON, *Appellant.*

(558 P. 2d 136)

Opinion filed December 11, 1976.

*Milo M. Unruh,* of Wichita, argued the cause and was on the brief for the appellant.

*Christopher A. Randall,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Keith Sanborn,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: Michael Blue (charged for some reason as "Michael Jackson a/k/a Michael Blue") appeals from a conviction for forgery. He was found guilty of knowingly delivering a forged prescription for Quaalude—a tranquilizer and sleeping tablet—to Consumer's Pharmacy in Wichita on the afternoon of July 7, 1975. The primary issue before the jury was whether he knew the prescription was forged when he presented it. On appeal he contends the evidence was insufficient on this issue. His chief complaints here, however, center on the state's rebuttal evidence.

The prescription, purportedly written by Dr. Daniel Thompson, was presented by the defendant to a clerk at Consumer's Pharmacy. The clerk could not read the patient's name, and Blue told him it was Minnie Diaz. The pharmacy had no record of a customer by that name, so the clerk gave him an information card to fill out. The defendant identified himself at that time as Michael Jackson. He scribbled an address, which he later testified he knew to be that of a cemetery, and returned the card. The card and prescription were handed by the clerk to Mary Wittstock, the pharmacist, who was

unable to fill the prescription because it lacked dosage directions. She called the office of Dr. Thompson and was told he had no patient named Minnie Diaz. At that point she refused to fill the prescription. The defendant insisted that it be filled, repeatedly saying, "She really needs it. Why can't she have it." He then asked to speak with the doctor's office, and the pharmacist redialed the number. The defendant, while speaking with the doctor's office, asked to see the prescription. When the pharmacist held it up for him to look at he took it from her hand and subsequently left the store with it.

Waiting for him outside in his car was Paula J. Goodbear, a young woman of American Indian ancestry who lived with him in his house. According to their testimony Paula was totally dependent on defendant for transportation; when she needed to run errands for herself or her friends, Blue drove her. The prescription, according to them, was for a friend of Paula's. The defendant testified he didn't know any Minnie Diaz (and hence, of course, couldn't know whether or not "she really needs it").

Blue and Goodbear next appeared later that afternoon at Polson's Pharmacy in the Twin Lakes shopping center. While the defendant looked at magazines and smelled cologne Ms. Goodbear presented the prescription, which was promptly recognized as a probable forgery. The police were called and she was taken into a back room for questioning; the defendant was allowed to go into the back room as well. Both were subsequently charged with forgery. Ms. Goodbear pleaded guilty in a separate proceeding; she testified in this case, "I kind of had an idea that it was forged when I went to Polson's. I got the idea that it was forged after it wasn't able to be refilled [sic] at Consumer's."

Appellant's first five points go to rulings surrounding the introduction of rebuttal evidence. Both the defendant and Ms. Goodbear testified that they had not visited any other pharmacies on July 7, but had stayed home that morning picking up the house. On rebuttal the state proposed to present evidence to the contrary. In an abundance of caution the court held a *Bly* hearing (*State v. Bly*, 215 Kan. 168, 523 P. 2d 397) outside the hearing of the jury. The proferred evidence was ruled inadmissible under K. S. A. 60-455 (it did not show any other crime or civil wrong) but was admitted as rebuttal evidence going to credibility.

The substance of the rebuttal evidence was that Home Drug East had filled a Quaalude prescription from Dr. Thompson for

Paula Goodbear *that morning,* and that the defendant had been with her.

The pharmacist from Home Drug East could not identify either Ms. Goodbear or the defendant, but did describe the woman who had the prescription filled as short, dark haired with an Indian complexion, wearing a halter top and a wide brimmed straw hat. Ms. Goodbear was wearing a halter top and wide brimmed straw hat when she was arrested that afternoon at Polson's. The prescription was in the name of Sandra Martinez; Sandra Martinez was the name used by Paula Goodbear when she visited Dr. Thompson. The Home Drug East pharmacist described his customer's companion as a young black man, about five foot ten and thin—a general description of the defendant. He was observed looking at magazines in the store while Ms. Goodbear had her prescription filled, and only because they departed together did the pharmacist conclude they had come in together.

Wichita police officer Zora M. Graves testified that she had responded to the call at Polson's. She questioned Ms. Goodbear, who first said that the fraudulent prescription belonged to her sister-in-law, then changed her story saying it belonged to her sister, Sandra Martinez. A search of Ms. Goodbear's purse after her arrest revealed two bottles of Quaalude, one dated July 3, the other the bottle dispensed by Home Drug East the morning of July 7. Both bottles plus the prescription form used at Home Drug East the morning of July 7 were admitted into evidence.

In two of his points appellant complains of the admission of all the above—the testimony of the Home Drug East pharmacist and Officer Graves, and the exhibits—on the grounds that it was immaterial and that it violated the intent and purpose of K. S. A. 60-455, the "other crimes" statute. The contention is based primarily on the fact that the Home Drug East pharmacist could not positively identify the defendant.

While the eyewitness identification was not positive the circumstantial evidence was convincing. The descriptions of Ms. Goodbear's physical appearance and of the clothing she was wearing at the time of her arrest matched those given by the Home Drug East pharmacist and, more importantly, she was in possession of the filled prescription, made out in the name she customarily used in her medical dealings. The conclusion is inescapable that Ms. Goodbear was the person who had the prescription filled at Home Drug East that morning. Further, both Blue and Goodbear testi-

fied that it was customary for them to run errands together because she had no other means of transportation. This, plus a general description of her companion fitting the defendant, gave rise to a ready inference that he was the man with her that morning.

The rebuttal evidence was competent to show that the testimony of Goodbear and Jackson that they did not visit any other pharmacy that day was false; it was thus admissible to attack their credibility under K. S. A. 60-420.

The trial court has broad discretion in determining the use and extent of relevant evidence in rebuttal (*State v. Barnes*, 220 Kan. 25, 551 P. 2d 815), and its ruling will not be ground for reversal absent abuse of discretion to the prejudice of the defendant. (*State v. Emery*, 218 Kan. 423, 543 P. 2d 897.) Admission of the rebuttal evidence, put forward to contradict facts brought forth in the defendant's evidence, was not error.

Nor did the admission of the evidence violate the spirit of the rule against "other crimes" evidence. K. S. A. 60-455, which precludes evidence of another crime or civil wrong to prove *disposition* to commit the crime currently charged, is simply not relevant. Although the state made a half-hearted effort in the *Bly* hearing to show that the prescription filled at Home Drug East was also forged, the pharmacist from that establishment testified that the prescription he filled was *valid*—he called Dr. Thompson's office and received the go-ahead. No crime or civil wrong was shown to have been committed, and the trial court correctly ruled that the evidence did not come under 60-455 but was admissible as an attack on credibility.

Appellant also argues that the trial court erred in failing to instruct the jury as to the limited purpose of the rebuttal evidence. The contention is without merit. At the close of the pharmacist's rebuttal testimony the court stated *in the presence of the jury:*

"I will advise the jury that this is exactly what it is, rebuttal testimony and this goes to the credibility of the witness, Paula Goodbear. You may call your next witness."

Appellant misconstrues the statement as a promise to advise the jury in the court's written instructions; it was in fact an on-the-spot instruction to the jury benefitting the defendant more than would have a delayed instruction. A similar on-the-spot instruction was given as to the limited purpose for which the exhibits were received. If appellant wished a further instruction at the close of the trial it

was incumbent upon him to make a request, which he did not do. See K. S. A. 22-3414 (3).

Appellant's final argument on the rebuttal evidence is that the prosecutor in closing argument improperly referred to the Home Drug East and Polson's incidents as demonstrating a "pattern." In his argument he described the conduct of the twosome who purchased Quaalude at Home Drug East in the morning, with the woman buying the drugs while the man stayed on the fringe of the activity. The prosecutor then went on:

"The evidence would also show that this is almost exactly the same pattern that was used at Polson's Pharmacy. Paula Goodbear went in. The Defendant hung around the outskirts, not quite going up to talk to her, according to his testimony. However, one of the clerks said, yes, the reason I noticed him is because he went up and talked or she said, couldn't remember, didn't know whether they talked but that they got together. They both deny that."

Appellant's argument is that the trial court had specifically ruled that the Home Drug East incident was inadmissible under 60-455, yet the prosecutor was permitted to argue that it showed a pattern of conduct—one of the purposes for which other crimes are admissible under 60-455. The state, however, correctly points out that the impeaching nature of the Home Drug East incident was not self-evident. It was necessary to demonstrate to the jury that the couple who purchased the drugs in the morning were Goodbear and Blue—only then would their testimony about staying home that morning be shown to be false. The identification of Blue was uncertain—as he argues here at length. However, the similarity between the conduct of Goodbear and Blue at Polson's in the afternoon and that of the Indian woman and black man at Home Drug East in the morning was one factor which might reasonably and logically support the conclusion that the two pairs were in fact the same. It was therefore proper for the state to point out the similarity in its closing argument.

Counsel may comment on the credibility of a witness where the comments are based on facts in evidence, and considerable latitude is allowed in that discussion. *State v. McClain,* 216 Kan. 602, 533 P. 2d 1277. The comments here did not exceed permissible bounds, and the court therefore properly overruled the defendant's objection and his motion for a new trial based on the alleged impropriety of the argument.

Appellant's final challenge goes to the sufficiency of the evidence on the element of defendant's knowledge that the prescription was

forged. Our review on this question is limited to looking for evidence supporting guilt to ascertain whether there was a basis for a reasonable inference of guilt, and the verdict will not be disturbed if there was substantial evidence from which the jury could draw that inference. *State v. Ritson,* 215 Kan. 742, 529 P. 2d 90.

Knowledge, like intent, is a state of mind which may be and most frequently is proven by circumstantial evidence. *Cf., State v. Gander,* 220 Kan. 88, 551 P. 2d 797. Appellant's actions while in Consumer's amply support an inference that he knew the signature to be forged. He falsely identified himself; he filled out an information card with an address he knew to be a cemetery; he insisted that "Minnie Diaz" really needed the drug, even though he did not know such a person; and he grabbed the prescription from the pharmacist just prior to leaving. All this conduct was far more consistent with guilty knowledge than with an innocent belief in the validity of the prescription.

Appellant further urges that while the jury could have inferred that he knew the prescription was invalid because it was incomplete, to then conclude that he knew it to be forged violates the rule against drawing an inference from an inference. See, *Broyles v. Order of United Commercial Travelers,* 155 Kan. 74, 122 P. 2d 763. The appellant, however, gave the false identification and address, and pleaded for the unknown Minnie Diaz, *before* he was informed the prescription was incomplete. These facts clearly gave the jury a basis from which it could draw a legitimate *concurrent* inference that the defendant knew of the forgery when he first presented the prescription. The evidence was sufficient on the issue of knowledge.

Affirmed.

APPROVED BY THE COURT.